UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE: SUSAN TRAVIS RIDGWAY

CASE NO. 10-01624-DWH
CHAPTER 7

BETTY RUTH FOX, CONSERVATOR OF
HENRY G. FOX, AND BETTY RUTH FOX,
INDIVIDUALLY

PLAINTIFF

VERSUS

ADV. PROC. NO. 10-00088

SUSAN TRAVIS RIDGWAY

DEFENDANT

ORDER

On consideration before the court is a complaint filed by Betty Ruth Fox, Conservator of

Henry G. Fox, and Betty Ruth Fox, Individually, ("Plaintiff"), against the Chapter 7 debtor, Susan

Travis Ridgway, ("Defendant"), seeking to deny the defendant's discharge in bankruptcy. Consistent

with the opinion entered contemporaneously herewith, it is hereby ordered and adjudged as follows,

to-wit:

1.      That part of the plaintiff's cause of action seeking the denial of the

defendant's discharge, pursuant to § 727(a)(5) of the Bankruptcy

Code, to the effect that the defendant failed to account for the

diminution of funds deposited into her brokerage, retirement, and

checking accounts is not well taken and is hereby dismissed.

2.      The plaintiff established by a preponderance of the evidence that the

defendant knowingly and fraudulently made material false

representations and omissions in connection with her bankruptcy

case. Therefore, the defendant's discharge will be denied pursuant to

§ 727(a)(4)(A) of the Bankruptcy Code.

ORDERED and ADJUDGED this the _10_th day of November, 2011.


DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE: SUSAN TRAVIS RIDGWAY

CASE NO. 10-01624-DWH
CHAPTER 7

BETTY RUTH FOX, CONSERVATOR OF
HENRY G. FOX, AND BETTY RUTH FOX,
INDIVIDUALLY

PLAINTIFF

VERSUS

ADV. PROC. NO. 10-00088

SUSAN TRAVIS RIDGWAY

DEFENDANT

OPINION

On consideration before the court is a complaint filed by Betty Ruth Fox, Conservator of

Henry G. Fox, and Betty Ruth Fox, Individually, ("Plaintiff"), against the Chapter 7 debtor, Susan

Travis Ridgway, ("Defendant"), seeking to deny the defendant's discharge in bankruptcy; an answer

and affirmative defenses having been filed by the defendant; and the court, having heard and

considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant

to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. §

157(b)(2)(J).

II.

PRE-TRIAL ORDER SECTIONS

In the pre-trial order, dated July 21, 2011, in Paragraph 7, the parties summarized their

respective positions, to-wit:

a.      Plaintiff: On March 21, 2009, the Defendant and her boyfriend, Richard Troy Jones, left the Jackson Hilton Hotel visibly intoxicated after attending a "Sweet Potato Queen" party. Jones was driving the Defendant's BMW, lost control of the vehicle, crossed the centerline of travel and struck head-on a vehicle driven by Henry Fox. The Defendant was engaged in actions which interfered with Jones's operation of the vehicle. Fox was severely injured in the accident. On March 10, 2010, the Foxes filed a Civil Action in the Circuit Court of the First Judicial District of Hinds County against the Defendant and others.

Shortly thereafter, the Defendant filed her Chapter 7 Petition for Relief. The Defendant made numerous mis-statements and omissions in her Schedules and Statement of Financial Affairs, failed to disclose assets, gave false oaths during her 341 Meeting, during her 2004 Examination and during her deposition in connection with the Adversary Proceeding. The Defendant has failed to explain satisfactorily, before determination of denial of discharge, the deficiency of assets to meet the Defendant's liabilities. The Defendant is not entitled to a discharge pursuant to § 727(a)(5) and (a)(4)(A).

b.      Defendant: On May 5, 2010, Defendant filed a Petition for Relief under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi, Case No. 10-01624-DWH. Plaintiff filed the instant action on September 14, 2010, requesting that Defendant be denied a discharge pursuant to § 727(a)(4)(A), (a)(6)(A) and (a)(5). Plaintiff has since withdrawn her claim that Defendant be denied a discharge pursuant to § 727(a)(6)(A). Plaintiff has also withdrawn her claims that Defendant undervalued her house and automobile.

Plaintiff filed this case objecting to Defendant's discharge and is attempting to have Defendant criminally prosecuted in an effort to punish Defendant for her alleged negligence which is the subject of a state court civil action styled *Betty Ruth Fox, as Conservator of Henry G. Fox and Betty Ruth Fox, Individually v. Richard Troy Jones, et al.*, Cause No. 251-10-180CIV; In the Circuit Court of the First Judicial District of Hinds County, Mississippi (the "State Court Action"). No claim asserted against Defendant in the State Court Action gives rise to a § 523 claim for relief by Plaintiff in this case. Plaintiff has not objected to Defendant's discharge under § 523 and the deadline for asserting such claim has expired.

2

Defendant has not made a statement under oath that was false, that Defendant knew was false, that was made with fraudulent intent, or that was material to Defendant's bankruptcy case. Defendant has not failed to explain satisfactorily, any loss of assets or deficiency of assets to meet her liabilities. Plaintiff has not shown, and cannot show, that Defendant should be denied discharge pursuant to § 727(a)(4)(A) and/or (a)(5).

In Paragraph 8, the parties stipulated to the following facts:

1.    On March 10, 2010, Plaintiff filed a civil action in the Circuit Court of the First Judicial District of Hinds County, Mississippi, styled *Betty Ruth Fox, as Conservator of Henry G. Fox and Betty Ruth Fox, Individually v. Richard Troy Jones, et al.,* Cause No. 251-10-180CIV ("State Court Action").

2.    In the State Court Action, Plaintiff plead a cause of action against Defendant for negligence and seeks damages against Defendant as a contributing cause of the subject accident.

3.    On May 5, 2010, the Defendant filed a Petition for Relief under Chapter 7 of the *United States Bankruptcy Code.*

4.    According to the schedules filed by the Defendant contemporaneously with the Defendant's Chapter 7 Petition ("Initial Schedules"), the Defendant has six creditors, consisting of Audi Financial Services, BancorpSouth, Trustmark National Bank, Chase Credit Card, Kroger Personal Finance and PRA Credit Card.

5.    The Defendant has reaffirmed all of her secured debt.

6.    Defendant purchased a 2010 Audi A5 after Plaintiff filed her State Court Action and before the Petition was filed.

7.    The Defendant's Initial Schedules did not schedule the claims of Plaintiff.

8.    The monthly payments required under the three Reaffirmation Agreements entered into by Defendant total $3,337.02. The reaffirmation Agreements all state that the Defendant's total monthly income is $3,083.00.

9.      In her Initial Schedules, the Defendant valued her household goods at $7,315.00, her art at $500.00, her clothes and shoes at $1,000.00, her jewelry at $400.00 and her 2010 Audi A5 at $38,025.00.

10.     At her 341(a) meeting of creditors, the Defendant testified under oath that she did not own a number of items of furniture in her home.

11.     The Defendant insured her personal property pre-petition for up to $294,000.00.

12.     The Defendant stated that her net worth exclusive of her home was $500,000.00 in September, 2008. Defendant did not own a home in September, 2008.

13.     On September 7, 2010, the Defendant filed her Amended Schedules and Statement of Financial Affairs ("Amended Schedules and SOFA") and her Amended Chapter 7 Statement of Monthly Income and Means-Test Calculation ("Amended Statement").

14.     The Defendant did schedule the claims of the Plaintiff against her in her Amended Schedules and SOFA. The Amended Schedules reflect that a number of items of furniture in her home belonged not to her, but to her children and her mother.

15.     Plaintiff filed the instant action on September 14, 2010, requesting that Defendant be denied a discharge pursuant to § 727(a)(4)(A), (a)(6)(A) and (a)(5).

16.     Plaintiff has withdrawn her claim that Defendant is not entitled to discharge for alleged violations of § 727(a)(6)(A). Plaintiff has withdrawn her claim that Defendant undervalued her house and automobile.

17.     Plaintiff has attempted to have criminal charges brought against Defendant in connection with the injuries sustained by Henry Fox on March 21, 2009.

18.     Plaintiff has attempted to have Defendant prosecuted in connection with the injuries sustained by Henry Fox on March 21, 2009.

19.     The Trustee in Defendant's bankruptcy, Stephen Smith ("Trustee"), has not objected to Defendant's discharge and/or has not joined in Plaintiff's objection to Defendant's discharge.

4

20.     Trustee has not asserted any claim against Defendant regarding false oaths or accounts or failure to explain a loss or deficiency of assets to meet Defendant's liability.

21.     Neither the Trustee or the United States Trustee has objected to or otherwise challenged Defendant's means-test calculation or Defendant's qualification as an eligible Debtor under Chapter 7.

22.     The Trustee filed Adversary No. 11-00046 against Defendant's mother, Judy Mullen ("Mullen"), alleging a preference payment by Defendant to Mullen in the amount of $10,000.00. The Trustee agreed to dismiss Adversary No. 11-00046 with prejudice without any recovery and an Agreed Final Order for Dismissal with prejudice was entered by the Court in that case.

III.

APPLICABLE LAW

The plaintiff's complaint is based on 11 U.S.C. §§ 727(a)(4)(A) and (a)(5), which provide

as follows:

(a) The court shall grant the debtor a discharge, unless–
    (4) the debtor knowingly and fraudulently, in or in connection with the case–
        (A) made a false oath or account;
    (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

IV.

SUMMARY OF PLAINTIFF'S CLAIMS

After considering the testimony, as well as, reviewing the documentary exhibits introduced

at trial, the court would summarize the plaintiff's claims against the defendant as they were initially

reflected in the pre-trial order, to-wit:

1.      Whether the defendant knowingly and fraudulently, in or in connection with her bankruptcy case, made false oaths or accountings concerning the following:

5

a.    By failing to schedule a claim that she had against a former employer, John Grafe.

b.    By failing to schedule and disclose income from the operations of a business.

c.    By failing to schedule and disclose that she was the beneficiary of two trusts.

d.    By failing to schedule and disclose that she was in possession of personal property purportedly owned by her mother and children.

e.    By giving false testimony in connection with the aforesaid personal property that she had in her possession which purportedly was owned by her mother and children.

f.    By failing to disclose income received from Oakmark Investments.

g.    By failing to schedule and disclose interest, dividend income, royalties, trust income, business income, and support from her mother in Schedule I of her bankruptcy schedules, and in her means test calculation.

h.    By failing to schedule and disclose the sale of stock.

i.    By failing to schedule and disclose her potential claim against Richard Troy Jones in connection with the accident that caused the injuries to Henry G. Fox.

j.    By falsely undervaluing her personal property and artwork.

k.    By failing to schedule and disclose a $10,000.00 payment made to her mother that occurred within the preference period prior to the filing of her bankruptcy case.

6

l.      By failing to schedule and disclose a payment made for the benefit of Richard Troy Jones.

m.      Whether the defendant failed to properly schedule the payments of alimony that she was awarded in a divorce proceeding against her former husband, Julius M. Ridgway, in the Chancery Court of Madison County, Mississippi.

n.      Whether the defendant failed to schedule and disclose the claim of the plaintiff against the defendant which had been filed in the Circuit Court of Hinds County, Mississippi.

2.      Whether the defendant adequately explained the diminution of certain assets that were deposited into her UBS brokerage account and her UBS retirement account, the source of said deposits being the aforementioned lump sum alimony awarded in her divorce proceeding, as well as, payments that she received representing an equitable division of the marital assets owned by the defendant and her former husband.

V.

DISCUSSION

A. Whether the Defendant Satisfactorily
Explained the Diminution of Her Assets

Significant portions of the defendant's assets were generated from a final judgment of divorce entered in the Chancery Court of Madison County, Mississippi, on May 6, 2008, which dissolved the defendant's marriage to Julius M. Ridgway, Jr. Incorporated in the final judgment of divorce was a child custody and property settlement agreement, dated April 24, 2008, which provided the following distributions to the defendant:

1.      An equitable distribution of the marital assets in the total sum of $265,000.00; $165,000.00 of which was payable within ten days, and

7

the remaining $100,000.00 was represented by a Qualified Domestic Relations Order.

2.  Lump sum alimony in the total sum of $135,000.00; $103,000.00 of which was payable within thirty days, and the balance was comprised of a transfer of 1,500 shares of Trustmark National Bank stock which was to be delivered within ten days.

3.  An award of child support for the one child born to the marriage of the parties in the sum of $1,500.00 per month, which was to begin on May 1, 2008.

4.  A health insurance payment in the sum of $300.00 per month which was to continue for a period of eighteen months.

A predominant amount of the defendant's liquid assets, including those mentioned hereinabove that were generated from the divorce proceeding, were deposited into her UBS brokerage account (See Exhibits D-19 and P-16) and into her UBS retirement account (See Exhibit D-18). A review of these exhibits reflects the following pertinent information:

1.  Both the brokerage account and the retirement account were opened in 2008 which is evidenced by the fact that both of these accounts had zero balances effective December 31, 2007.

2.  The net amount invested in the brokerage account was $286,711.61, and the net amount invested in the retirement account was $162,805.33.

3.  During 2008, the brokerage account experienced a market decline in value of $40,298.42, and the retirement account experienced a market decline in value of $48,864.90. In effect, because of market conditions, these two accounts lost a total value of $89,163.32 in one calendar year.

4.  The brokerage account monthly statements clearly reflect that the lump sum alimony of $103,000.00, and the 1,500 shares of Trustmark stock were deposited into this account. According to the June, 2008 brokerage account monthly statement, the lump sum alimony deposit was actually reflected as $103,500.00, and the Trustmark stock was reflected in the equity section of the statement. The court did not

8

have the benefit of being able to review the May, 2008 brokerage account statement. The Trustmark stock remained in this account until it was sold on November 6, 2008, for the price of $31,829.76, which represented a net taxable gain, considering the cost basis of the stock, of $28,964.76.

5.   In June, 2008, the brokerage account had a beginning balance of $195,184.01, and an ending balance of $273,543.05, which was the highest balance in the account as reflected on the exhibits presented to the court. The sizeable increase during this one month period was the result of the deposit of the lump sum alimony.

6.   In December, 2008, the brokerage account monthly statement reflected a beginning balance of $237,301.27, and an ending balance of $7,594.77. The reduction in the balance was caused by the withdrawal of $228,300.00, representing the defendant's down payment on her new residence, which occurred through two wire transfers on December 4, 2008, and December 16, 2008.

7.   The annual summary of activity in the brokerage account for 2008 reflected annual withdrawals of $256,307.14, the majority of which was the aforementioned down payment on the defendant's house, and the total market decline in value, mentioned hereinabove, in the sum of $40,298.42, for a total reduction of $296,605.56.

8.   Insofar as the defendant's retirement account was concerned, the court was presented only three of the monthly bank statements. Two of the statements were in Exhibit D-18, and the third statement was a part of Exhibit P-16. During the month of May, 2008, there was an initial infusion of $64,226.06. Because of withdrawals plus a positive market increase, the ending balance for this month was $48,962.98.

9.   In September, 2008, the beginning balance in the retirement account had risen to $154,294.48. After deducting withdrawals and a significant market decline, the ending balance for this particular month was $142,085.52, which was comprised of equities having a value of $107,961.30, plus cash in the sum of $34,124.22.

10.  The final statement presented to the court for the defendant's retirement account was applicable to the month of November, 2008. It reflected a beginning balance of $121,556.85, and an ending balance of $114,363.60. A summary of the 2008 activity for the retirement account reflected the following:

9

| | |
|---|---|
| Net Investment | $162,805.33 |
| Dividend and Interest Income | 423.17 |
| Market Change | (48,864.90) |
| | |
| Value of Account | $114,363.60 |
| (Effective 11/28/08) | |

11.  At some point in time, the defendant's brokerage account was closed. The retirement account remains open and was disclosed on the defendant's bankruptcy schedules as having a balance, effective the date of the filing of the petition, in the sum of $143,307.00. The defendant claimed this amount as exempt pursuant to § 85-3-1(c)(iii), Miss. Code Ann. (2008).

In summary, the UBS brokerage account statements and the UBS retirement account statements reflect that the defendant deposited most, if not all, of the income that she received in the divorce proceeding plus additional funds into these accounts. While there were inconsequential variances which were not explained and which could not be otherwise determined because of the absence of certain statements, the following summarizes the court's observation, to-wit:

| | | |
|---|---|---|
| 1. | Brokerage Account (Net Amount Invested) | $286,711.61 |
| | Retirement Account (Net Amount Invested) | 162,805.33 |
| | | |
| | Total | $449,516.94 |
| | | |
| 2. | Lump Sum Alimony | |
| | (Cash plus Trustmark Bank Stock) | $135,000.00 |
| | Equitable Distribution of Marital Assets | 265,000.00 |
| | | |
| | Total | $400,000.00 |
| | | |
| | Other Investments or Deposits | $ 49,516.94 |
| | (a "plugged" number which is only | |
| | an approximation) | |
| | | |
| | Net Amounts Invested Both Accounts | $449,516.94 |

10

From the total amounts invested in both accounts, which were excerpted from the bank statements, the court would deduct the defendant's withdrawals, as well as, the market declines, to-wit:

| | |
|---|---|
| Net Amounts Invested in Both Accounts | $449,516.94 |
| Less: Withdrawals including | |
| $228,300.00 house down payment | 256,307.14 |
| Market Declines in Both Accounts | 89,163.32 |
| | |
| Net Amount Remaining | $104,046.48 |

While the net amount remaining, $104,046.48, is actually less than the defendant's balances in her two accounts, i.e., retirement account - $114,363.60, and brokerage account - $7,594.77, effective December, 2008, the collective statements that were introduced into evidence provide a reasonable explanation of the disposition of the defendant's funds during this particular period of time. Within these records, there is also a full disclosure of the sale of the Trustmark stock and the disposition of the proceeds realized from that sale.

Succinctly stated, the net balances remaining in the defendant's two accounts at the close of 2008, ($104,046.48), plus the explanation of her withdrawals for personal expenses ($28,007.14) and her withdrawals for the house down payment ($228,300.00), as well as, the market declines in both accounts, ($89,163.32), is equivalent to the total amounts invested in the accounts ($449,516.94). Consequently, the court is of the opinion that the plaintiff's cause of action that the defendant failed to account for the diminution of funds deposited into her retirement and brokerage accounts is not well taken.

In her post-trial memorandum, the plaintiff stated that "the Debtor gave only a vague and general explanation to the disposition of the $237,000.00 deposited into her checking account during

11

the two years preceding the filing of the Petition." Other than the defendant's responses to a very

limited number of questions posed to her at trial, which were to the effect that these funds were used

for living expenses for the defendant and her children, there was little attention focused on this

account which was the defendant's Umbrella Checking Account at Trustmark. However, all of the

bank statements were introduced into evidence (Exhibit P-17), which included copies of all of the

checks utilized to expend the funds deposited. If there was anything remarkable within those checks,

it was not mentioned to the court. At the conclusion of this two year pre-petition period, the balance

on hand was not overly significant, which indicates that the monies may well have been spent as the

defendant suggested. The court cannot at this time undertake a forensic accounting investigation as

to the source of the deposits which, consistent with the manner in which they are usually reflected

on bank statements, were primarily unidentified, except as to the dates and the amounts. Like the

retirement and brokerage accounts, the defendant has produced all of the evidence reflecting activity

in her Umbrella Checking Account, and this satisfactorily explains the disposition of the funds

deposited. Consequently, that part of the plaintiff's cause of action that the defendant failed to

account for the diminution of funds deposited into this particular checking account is not well taken.

> B. Whether the Defendant Knowingly and Fraudulently,
> in or in Connection with Her Bankruptcy Case,
> Made False Oaths or Accountings.

The genesis of this bankruptcy case is clearly the accident that occurred on March 21, 2009,

which literally destroyed the ability of the plaintiff's husband to enjoy a productive life. While the

defendant was not driving her vehicle when the accident occurred, the parties have stipulated that

the plaintiff has pled a cause of action against the defendant for negligence by contributing to the

12

cause of the accident. But for this accident, this bankruptcy case would likely not have been filed. However, filing a legitimate bankruptcy case was the only way the defendant could escape personal liability for damages should a judgment be rendered against her in the aforementioned state court litigation. Consequently, this court was astonished that the defendant was so careless and evasive in preparing her initial bankruptcy schedules ("schedules") and her statement of financial affairs ("SOFA"). Indeed, several material omissions were repeated in her amended schedules and amended SOFA. The court will address each of the omissions and misrepresentations asserted by the plaintiff, to-wit:

a.          Failing to schedule a claim that the defendant had against her former employer, John Grafe - The defendant testified without contradiction that Grafe was heavily indebted to other creditors, and that a claim against him was virtually worthless. While the amount of this potential claim was never specified, the attorneys representing the defendant also indicated that a cause of action to enforce this claim was likely barred by the applicable statute of limitations. The defendant never amended her schedules to reflect this claim. Accordingly, the absence of disclosure afforded the Chapter 7 trustee and/or the plaintiff little opportunity to investigate its viability.

b.          Failing to schedule and disclose income from the operations of a business - In each of her SOFAs, the defendant indicated that she earned income from her business, Interiors Market of Jackson, Inc., in 2008 in the sum of $13,050.00, and in 2009 in the sum of

13

$16,358.00. These numbers are consistent with the income numbers that appear on her 2008 and 2009 federal income tax returns (Exhibits D-20 and P-23, respectively). The defendant's 2008 income tax return revealed that the defendant also paid taxes on business income, presumably generated from the aforementioned business, in the sum of $8,207.00, which was not disclosed on the SOFAs. The debtor's 2009 income tax return indicated that the business lost the sum of $323.00. Although this loss was deducted on the applicable tax return, it was not on the SOFAs. The defendant testified that she relied extensively on her tax returns when preparing her bankruptcy schedules and SOFAs.

c.       Failing to schedule and disclose that she was the beneficiary of two trusts - The defendant currently has a 1/12th vested interest in The Ruth Einhaus Toler Family Trust ("Toler trust"), as well as, a contingent remainder interest in The Robert Cecil Travis Irrevocable Trust ("Travis trust"). The defendant's mother, Judy Toler Mullen, currently maintains the controlling interest in the Travis trust. (Robert Travis was the defendant's father.) At the death of her mother, the defendant will become the sole owner of any funds remaining in the Travis trust, which was initially funded through two $400,000.00 life insurance policies. These factors provide ample motive for the defendant to keep the Travis trust "under wraps."

14

In her original and amended SOFAs, the defendant disclosed that she was the recipient of $17,094.00, representing "trust income/payments made on her behalf," during the two year period preceding the filing of her bankruptcy case. In her 2008 and 2009 income tax returns, the defendant reported the following regarding distributions from the Toler trust, to-wit:

| Income Reported | 2008 | 2009 |
|---|---|---|
| Trust Distribution | $8,547.00 | $7,763.00 |
| Taxable Interest | 1,178.00 | 1,015.00 |
| Ordinary Dividends | 633.00 | 552.00 |
| | $10,358.00 | $9,330.00 |

Total for both 2008 and 2009                    $19,688.00

The total that the defendant set forth on both of her SOFAs is $2,594.00 less than the numbers appearing on her two tax returns. ($19,688.00 - $17,094.00)

While the SOFAs indicate that the defendant was receiving a trust distribution, the defendant in her initial schedules and in her amended schedules failed to respond to Item 20, Schedule B - Personal Property, which clearly requires the disclosure of contingent and non-contingent interests in a trust. At trial, the defendant indicated that she did not disclose either of these trusts because they were spendthrift trusts and not considered as property of her

15

bankruptcy estate. The court is of the opinion that the defendant did not have the discretion to make the determination as to whether the trusts should have been disclosed. The case trustee, as well as, the other creditors should have been given an opportunity to examine the trust indentures. If any of these parties disputed the nature of the trusts, that issue should have been presented to the court for a determination. *See, In re Katz,* 203 B.R. 227, 234 (Bankr. E.D. Pa. 1996); *In re Portner*, 109 B.R. 977, 989 n.8 (Bankr. D. Colo. 1989); and *Matter of Patterson,* 70 B.R. 124, 130 n.3 (Bankr. W.D. Mo. 1986).

At trial, the defendant testified that she submitted both trusts to the Chapter 7 trustee at the first meeting of creditors, which was held on June 17, 2010. However, while she clearly disclosed the Toler trust, she was somewhat evasive about the existence of the Travis trust. The following questions and the defendant's answers were excerpted from the transcript of the first meeting of creditors hearing:

MS. FOX: Uh-huh. Uh-huh. The -- the --the Ruth Inhouse [sic] Toller [sic] Trust, is that -- there's just one trust; is that correct?

MR. PITTMAN: Okay.

MS. FOX: Is that -- is that correct?

THE WITNESS: Yes, there's one trust, my grandmother's trust.

16

MR. NOBLE: That's the trust -- that's the only trust that she's receiving income from, yes.

MS. FOX: Okay.

(See Exhibit P-25, pages 55-56)

When she was deposed on August 12, 2010, pursuant to Rule 2004, Federal Rules of Bankruptcy Procedure, the defendant was asked, "Are you a beneficiary of any trusts" She responded, "I don't know." (Exhibit P-30, pg. 27) Indeed, these transcripts reflect with clarity that the defendant was not forthcoming about her beneficial interest in the Travis trust.

As pointed out by the plaintiff's counsel, there also was no disclosure relative to the annual distribution from the Toler trust in 2010, which would have occurred very close to the time that the defendant's bankruptcy case was filed. The court is of the opinion that both of these trusts should have been disclosed in the defendant's original schedules, and certainly in her amended schedules. Although their existence is now well known, the continued failure to disclose is clear evidence of the defendant's lack of candor and disregard for the integrity of the bankruptcy process.

d.          Failing to schedule and disclose that she was in possession of personal property purportedly owned by her mother and children - A significant portion of the trial focused on the defendant's valuation of

17

her personal property assets in her bankruptcy schedules. The debtor's valuations of her household furnishings and artwork, totaling $7,815.00, were identical on both her original schedules and her amended schedules, filed respectively on May 5, 2010, and September 7, 2010. The defendant indicated that she thought that she was to value these assets at a "garage sale" liquidation value, which she said was 10% to 15% of the retail value.

The plaintiff presented the expert testimony of Benny Taylor, an auctioneer and appraiser of personal property, who was actually employed by the Chapter 7 trustee to inspect and appraise the defendant's personal property. Taylor appraised the items located at the defendant's residence on a liquidation basis in the total sum of $30,450.00. He deducted the value of items that the defendant told him were owned by others in the sum of $10,340.00, and then allocated a value of $20,110.00 to the defendant's property. The defendant, through her attorneys, disagreed significantly with Taylor's values. Numerous photographs were introduced into evidence of the appraised items, and several reflected that some of the items were in a condition of disrepair. In addition, a lengthy letter, written by the defendant's attorney to the Chapter 7 trustee, was introduced which outlined in detail the disagreements with Taylor's appraisal on an item by item basis. (See Exhibit D-16)

18

The Chapter 7 trustee testified that he had considered the Taylor appraisal, the letter criticizing the appraisal written by the defendant's attorney, as well as, the fact that several of the items were owned by others. He testified that he actually disputed the defendant's values by only $4,000.00 to $5,000.00, and indicated that he did not consider this significant enough to pursue.

One of the plaintiff's concerns about the personal property valuations on the defendant's schedules was prompted by the household goods valuation that was set forth in her home insurance policy in the sum of $294,000.00. Russell Healy, an agent for Nationwide Insurance who wrote the defendant's homeowners coverage, explained that the value in the insurance policy was "up to $294,000.00," and this was simply based on a standard policy coverage provision which requires the household goods to be insured at 70% of the insured's home value, which in this case was $420,000.00. Any loss would be compensated on the actual value of the property destroyed or damaged.

A second incident also focused the plaintiff's attention on the values that the defendant had allocated to her household furnishings. On December 4, 2008, the defendant indicated in a Uniform Residential Loan Application that she owned personal property, excluding her vehicle, having a value of $50,000.00. (See Exhibit P-

19

28)  While this was likely only an effort to "beef up" the application to better insure that the loan would be approved, it is also a "red flag" warning as to the defendant's credibility.

The Chapter 7 trustee indicated that he did not think that the debtor attempted to conceal her personal property.  He confirmed, as did Taylor, that the defendant was very cooperative in permitting the appraisal.  He further indicated that the defendant provided all of the documents that he requested and answered all questions to his satisfaction. While the court finds this testimony to be significant, it is not sufficient to overcome all of the errors, misrepresentations, and omissions that were perpetrated by the defendant.

e.      Giving false testimony in connection with the aforesaid personal property that she had in her possession which purportedly was owned by her mother and children - In her original schedules and SOFA, the defendant failed to disclose that certain items of personal property, furniture, and furnishings located in her residence were actually owned by her mother and her children.   Although the defendant was careless and even cavalier in preparing her bankruptcy schedules, this error was acknowledged when she filed her amended schedules and amended SOFA.  Of some concern to the court is the fact that Benny Taylor, the appraiser, mentioned hereinabove, testified at trial that the defendant had told him that some of the items

20

were owned by her boyfriend, Troy Jones. In the amended SOFA, no items were listed as being owned by Jones.

f.         Failing to disclose income received from Oakmark Investments - The defendant testified that the funds received from Oakmark Investments were proceeds from a mutual fund "earmarked" for the benefit of her children. While this was not vigorously contested, the court noted, as did plaintiff's counsel, that on May 30, 2008, the defendant made two deposits into her Umbrella Checking Account at Trustmark Bank as a result of the sale of Oakmark Investments stock in the sums of $7,744.18 and $2,339.73. (See Exhibit P-17) While these proceeds may well have been used for the benefit of the defendant's children, the funds were clearly co-mingled in her banking account.

g.         Failing to schedule and disclose interest, dividend income, royalties, trust income, business income, and support from her mother in Schedule I of her bankruptcy schedules, and in her means test calculation - In her original Schedule I, (Current Income of Individual Debtor(s)), the defendant failed to include any parental assistance from her mother, as well as, a monthly pro-ration of the annual distribution that she received each year from the Toler trust, regardless of whether the distribution was a payment of trust income, the payment of taxable interest, or the payment of ordinary dividends.

21

In her amended Schedule I, the defendant only added the parental assistance from her mother in the sum of $3,300.00 per month. (Following a review of her bank statements, the court is of the opinion that this amount is perhaps understated.) The defendant failed to add any distributions from the Toler trust when she amended Schedule I. (Parenthetically, the court would point out that if Social Security benefits are required to be disclosed on Schedule I, then income from a trust, even a "spendthrift" trust, should also be disclosed.)

Without question, the defendant's initial means test calculation was woefully deficient. Like the amended Schedule I, the defendant's amended means test calculation only added the $3,300.00 per month parental assistance from the defendant's mother. No income was reflected as being received from the Toler trust which clearly caused the income amount to be understated.

In both the original and the amended SOFAs, the defendant failed to include the 2008 business income in the sum of $8,207.00, mentioned in paragraph b. hereinabove, which she reported on her 2008 income tax return. She did, however, include on both versions of her Schedule I and her means test calculations an entry for business income in the sum of $333.00 per month or $3996.00 annually. This

22

would be in addition to her business wages which were also scheduled.

In question 2 on both her original and amended SOFAs, the defendant failed to include the $135,000.00 in lump sum alimony that she was paid within two years of the filing of her petition. She did list "Child Support/Alimony" totaling $22,400.00. However, this appears to be a misaddition of the numbers $20,100.00 and $2,400.00, which were reported on her income tax returns for 2008 and 2009. Other than the extrapolation of these numbers from the defendant's tax returns, the court does not know the source of these numbers, which would not be equivalent to the total monthly child support payments for a two year period. ($1500.00 per month for twenty-four months - $36,000.00) The defendant also did not include the $300.00 per month for medical insurance paid by her former spouse for eighteen months which would certainly be considered alimony or spousal support.

As set forth hereinabove, the Toler trust distributions for this two year period, which would include the payment of the taxable interest and the ordinary dividends was understated by $2,594.00. Although the defendant may not have considered the parental assistance as income, she obviously did not include any of the

23

payments made to her by her mother on either the original or the
amended SOFAs.

h.          Failing to schedule and disclose the sale of stock - The court
presumes that this assertion by the plaintiff refers to the disposition
of the 1500 shares of Trustmark National Bank stock which the
defendant received as a part of the lump sum alimony. As set forth
earlier, the Trustmark stock remained in the defendant's brokerage
account until it was sold on November 6, 2008, for the price of
$31,829.76, which represents a net taxable gain, considering the cost
basis of the stock, in the sum of $28,964.76. Although the sale of this
stock was clearly disclosed   in the defendant's UBS brokerage
account statements, it was never disclosed by the defendant in either
her original or her amended SOFAs under item 10. Other transfers.

i.          Failing to schedule and disclose her potential claim against
Richard Troy Jones in connection with the accident that caused the
injuries to Henry G. Fox - The defendant failed to disclose this
potential claim in both her original and her amended schedules and
SOFAs. The Chapter 7 trustee indicated in his testimony that he is
aware of this claim and is conducting an investigation as to its
viability under the uninsured motorist provision in the defendant's
insurance policy. The trustee's decision to pursue this claim does not
excuse the defendant's failure to disclose the claim if she was aware

24

of its existence. The court, however, does not recall any testimony concerning whether the defendant knew that she had a potential claim against Jones.

j.      Falsely undervaluing her personal property and art work - This claim, asserted by the plaintiff, was discussed in paragraph d. hereinabove.

k.      Failing to schedule and disclose a $10,000.00 payment made to her mother that occurred within the preference period prior to the filing of her bankruptcy case - When the defendant purchased her new Audi automobile shortly before filing bankruptcy, she borrowed an additional $10,000.00 over the amount that was necessary to actually finance the purchase price of the vehicle. These proceeds were deposited into a Wachovia Bank account in the name of the defendant's mother. Thereafter, the defendant's mother utilized these funds to make house payments for the defendant, to pay at least one payment on the vehicle note, as well as, to pay expenses incurred by the defendant's children. (See Exhibit P-29) When the Chapter 7 trustee first became aware of this $10,000.00 transfer, he initiated a cause of action against the defendant's mother to recover the $10,000.00 as a voidable preference. However, once he learned of the actual disposition of the funds, he dismissed his complaint with prejudice. While this transaction could possibly be viewed as a

misguided attempt to conceal $10,000.00, the net effect was that the defendant had payments made for her and for her children from monies that she had simply borrowed.

l.      Failing to schedule and disclose a payment made for the benefit of Richard Troy Jones - The defendant failed to schedule this payment in her original SOFA. However, following the first meeting of creditors hearing and her Rule 2004 examination, the defendant did disclose that she had paid a $10,000.00 retainer for the benefit of Jones to Attorney John Collette. This is yet one more example of the defendant's lack of candor with the court and her disregard for the integrity of the bankruptcy process. The court was not advised as to whether the trustee intends to pursue the recovery of this transfer which apparently occurred in March, 2010, during the preference period.

m.      The defendant's failure to properly schedule the payments of alimony that she was awarded in a divorce proceeding against her former husband, Julius M. Ridgway, in the Chancery Court of Madison County, Mississippi - While the defendant received $135,000.00 as lump sum alimony slightly less than two years prior to the date that she filed her bankruptcy petition, she failed to appropriately disclose the award, discussed in detail hereinabove, on both her original and amended SOFAs. The defendant attempted to

26

explain that she extracted the $22,400.00 figure, reflected as "Child

Support/Alimony" on her SOFAs, from her tax returns for 2008 and

2009. While the numbers on her tax returns, $2,400.00 (2008) and

$20,100.00 (2009) approximate the total number utilized by the

defendant, the court was not provided a plausible explanation as to

why the defendant relied on these numbers. The defendant has yet to

correct these misstatements.

n.        The defendant's failure to schedule and disclose the claim of

the plaintiff against the defendant which had been filed in the Circuit

Court Hinds County, Mississippi - Without question, this is the most

glaring omission that the defendant made in her original schedules.

This is the very claim that prompted the filing of the defendant's

bankruptcy case. The defendant has now included this claim, which

was known to everyone, in her amended schedules. The level of

carelessness in initially omitting this claim is simply stunning.

VI.

DISCUSSION

Collier on Bankruptcy, ¶ 727.04, discussing the denial of discharge because of a false oath,

provides the following comments:

> [W]hereas a discharge may only be barred under section 727(a)(2) if the debtor's
> intent was to defraud a creditor or an officer of the estate, section 727(a)(4) does not
> so limit the objects of the debtor's fraudulent intent. The requisite intent, moreover,
> may be discovered by inference from the facts. "A reckless disregard of both the
> serious nature of the information sought and the necessary attention to detail and

27

accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge." However, a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent.

. . . .

. . . . Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditor's ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition.

. . . .

Omission of property from verified schedules may be both a false oath and a concealment. It is not only omissions of property from schedules that may constitute false oaths: Included also are false statements about books, papers and deeds, and facts about the debtor's ownership of property.

. . . .

A debtor may also be denied a discharge for making "false oaths" at hearings during the case if the statements are knowingly and fraudulently false. This includes statements made by the debtor when being examined at creditors' meetings, or at other hearings during the course of the case.

6 Collier on Bankruptcy ¶ 727.04[1][a]-[3] (16th ed. 2010).

The party seeking a denial of discharge has the burden of proving: (1) that the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent or reckless indifference to the truth; and (5) the statement related materially to the bankruptcy case. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992); and *Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

In *Beaubouef*, the facts are straightforward. After a two day trial, the bankruptcy court entered a judgment denying the discharge of the debtor, Ronald Beaubouef, pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(4)(A), and (a)(5). 966 F.2d at 175. The court did so based, in substantial part,

28

on evidence relating to the debtor's undisclosed involvement in and ownership of a corporation

known as American Container & Chassis Repair, Inc. *Id.* at 175-76. The judgment of the

bankruptcy court denying the discharge was affirmed by the district court, and, thereafter, by the

Fifth Circuit. *Id.* at 175. The Fifth Circuit offered the following comments:

> The elements of an objection to discharge under § 727(a)(4)(A) must be proven by
> a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct.
> 654, 660, 112 L.Ed.2d 755 (1991). False oaths sufficient to justify the denial of
> discharge include "(1) a false statement or omission in the debtor's schedules or (2)
> a false statement by the debtor at the examination during the course of the
> proceedings." 4 *Collier on Bankruptcy* ¶ 727.04[1], at 727-59 (15th ed. 1992).
>
> . . . The bankruptcy court correctly noted that a discharge cannot be denied when
> items are omitted from the schedules by honest mistake. *See* 4 *Collier on
> Bankruptcy*, ¶ 727.04[1A]. However, the bankruptcy court found that the existence
> of more than one falsehood, together with Ronald's failure to take advantage of the
> opportunity to clear up all inconsistencies and omissions when he filed his amended
> schedules, constituted reckless indifference to the truth and, therefore, the requisite
> intent to deceive. *See In re Sanders*, 128 B.R. 963, 972 (Bankr.W.D. La. 1991).
> These findings are supported by the record and are not clearly erroneous.
>
> . . . "In determining whether or not an omission is material, the issue is not merely
> the value of the omitted assets or whether the omission was detrimental to creditors."
> 4 *Collier on Bankruptcy*, ¶ 727.04[1], at 727-59. "The subject matter of a false oath
> is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the
> bankrupt's business transactions or estate, or concerns the discovery of assets,
> business dealings, or the existence and disposition of his property." *In re Chalik*, 748
> F.2d 616, 617 (11th Cir. 1984).
>
>> The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of
>> discharge by asserting that the admittedly omitted or falsely stated
>> information concerned a worthless business relationship or holding; such a
>> defense is specious. It makes no difference that he does not intend to injure
>> his creditors when he makes a false statement. Creditors are entitled to judge
>> for themselves what will benefit, and what will prejudice, them. The veracity
>> of the bankrupt's statements is essential to the successful administration of
>> the Bankruptcy Act.

29

> . . . Full disclosure of assets and liabilities in the schedules required to be filed by one
> seeking relief under Chapter 7 is essential, because the schedules "serve the
> important purpose of insuring that adequate information is available for the Trustee
> and creditors without need for investigation to determine whether the information
> provided is true." *In re Urban*, 130 B.R. 340, 344 (Bankr. M.D. Fla. 1991).

966 F.2d at 178-79 (footnotes omitted).

In *Sholdra*, the debtor, during a deposition, admitted that certain information in his schedules and statement of financial affairs was false. 249 F.3d at 381. One week after the deposition had been concluded, the debtor amended his schedules and statement of financial affairs purporting to correct the false statements. *Id.* Because the debtor admitted the falsity of the statements, the only issue on appeal was whether the debtor "made such statements with fraudulent intent or reckless indifference to the truth, which can be proven by circumstantial evidence." *Id.* at 382. In affirming the denial of the debtor's discharge, the Fifth Circuit indicated as follows:

> It is undisputed that Appellant made materially false statements in his schedules and
> statement of financial affairs and amended them only after his deposition confirmed
> the falsehood. When confronted with Appellee's motion, Appellant remained silent
> and did not present any facts creating genuine issues of material fact. In light of these
> circumstances, we agree with the district court that Appellant made the false
> statements with fraudulent intent. *See Economy Brick Sales, Inc. v. Gonday (In re
> Gonday)*, 27 B.R. 428, 432 (Bankr. M.D. La. 1983) ("[T]he cumulative effect of all
> the falsehoods together evidences a pattern of reckless and cavalier disregard for the
> truth [to support] fraudulent intent."); *Oldendorf v. Buckman*, 173 B.R. 99, 105 (E.D.
> La. 1994). As we have noted, "[f]ull disclosure of assets and liabilities in the
> schedules required to be filed by one seeking relief under Chapter 7 is essential."
> *Beaubouef*, 966 F.2d at 179.
>
> Finally, Appellant's inexperience with financial affairs or reliance on
> incorrect advice or information, even if true, cannot withstand summary judgment.
> Appellant's purported inexperience with financial affairs does not negate the fact that
> he made false oaths by knowingly swearing to false information.

*Id.* at 383.

30

In *In re Gartner*, 326 B.R. 357 (Bankr. S.D. Tex. 2005), the Chapter 7 trustee and a judgment creditor filed a complaint seeking the denial of the debtor's discharge pursuant to §§ 727(a)(3) and (a)(4)(A). *Id.* at 361. The bankruptcy court concluded that the debtor had made the following false statements under oath, to-wit:

1. The debtor understated his annual income on both the original and the amended statements of financial affairs.

2. The debtor understated his monthly income in Schedule I.

3. The debtor failed to disclose his affiliations and/or relationships with eight corporations.

4. The debtor failed to list his stock ownership in several businesses.

5. The debtor failed to disclose a house lease and the payment of rent on this lease to his parents.

6. The debtor failed to disclose that he was a member of a health club, and, in this context, he failed to disclose as income the payment of his membership dues by friends in response to "favors" that he provided for them.

7. The debtor did not disclose that boxes of his records were in the possession of others.

*Id.* at 363-67.

The bankruptcy court cited the Fifth Circuit's decisions in *Beaubouef* and *Sholdra* and commented as follows:

> In upholding the denial of discharge, the Fifth Circuit noted that it could not deny the discharge merely for honest mistakes. *Id.* (citing 4 Collier on Bankruptcy, ¶ 727.04[1A]). However, the Fifth Circuit held that there was sufficient evidence of the debtor's reckless indifference to the truth based on "the existence of more than one falsehood, together with [the defendant]'s failure to take advantage of the

31

opportunity to clear up all inconsistencies and omissions when he filed his amended Schedules." *Beaubouef*, 966 F.2d at 178 (citing *In re Sanders*, 128 B.R. 963, 972 (Bankr. W.D. La.1991)).

Like the debtor in *Beaubouef*, Gartner failed to list any of his business relationships in his original filings. Similar to the debtor in *Beaubouef*, Gartner only amended his Statement of Financial Affairs and Schedules months after a deposition taken by the Plaintiffs' and over one year after Gartner's initial filing.

. . . .

It is also worth noting that the Fifth Circuit has made it clear that a debtor is not entitled to a discharge where the debtor makes statements under oath with "reckless indifference to the truth." *Sholdra*, 249 F.3d at 382. The Fifth Circuit has held that a showing of reckless indifference to the truth is equivalent to showing the requisite fraudulent intent to deceive sufficient to bar a discharge under 727(a)(4)(A). *Beaubouef*, 966 F.2d at 178. A debtor who makes more than one false statement under oath with an opportunity to clear up the inconsistencies has demonstrated his recklessness, which is sufficient for the bankruptcy court to infer the debtor's requisite intent. *Id.* Gartner demonstrated his reckless indifference to the truth by failing to give full and complete disclosures in both his initial and amended Schedules and Statements of Financial Affairs. *See id; see also Sholdra*, 249 F.3d at 382. As a result, Gartner's reckless indifference to the truth is sufficient to meet the fourth element of the *Beaubouef* test.

. . . .

A false oath is material if it relates to the debtor's business transactions or concerns the discovery of assets or business dealings. *Beaubouef*, 966 F.2d at 178 (quoting *In re Chalik*, 748 F.2d 616, 617 (11th Cir.1984)). A debtor's claim that he omitted an asset because the asset has no value or would not be detrimental to creditors is irrelevant and without merit. *Beaubouef*, 966 F.2d at 178 (quoting 4 Collier on Bankruptcy, ¶ 727.04[1], at 727-59). "Creditors are entitled to judge for themselves what will benefit, and what will prejudice them." *Chalik*, 748 F.2d at 617 (citation omitted).

. . . .

While Gartner's failure to include certain items in his original Schedule or Statement of Financial Affairs appears to be a mere technical defect on its face, the Fifth Circuit does not find such omissions to be so trivial. Even technical defects in Gartner's Schedules and Statement of Financial Affairs constitute material omissions because the disclosure of the information omitted may have assisted Gebhardt in assessing Gartner's financial condition. Furthermore, there were more than a few defects in the initial Schedules and Statement of Financial Affairs. The Plaintiffs complain of, and the Court finds, at least eight instances where Gartner failed to list

32

required information in his Schedules and Statement. Finally, Gartner did not immediately correct these defects, nor did he correct *all* of the omissions when he finally did file the amended Schedules and Statement. As a result, the omissions and defects constitute false oaths sufficient to bar a discharge of Gartner's debts.

*Id.* at 371-74.

The defendant, Susan Travis Ridgway, made numerous misrepresentations and omissions in her schedules, SOFAs, and amended means test calculation. Some of them are much more serious than the others. Indeed, a few could actually be excused if her overall actions were not so pervasive. Regardless, the pattern of conduct exhibited by the defendant, in swearing under oath to the accuracy of her schedules and SOFAs, evidences a reckless indifference to the truth and, therefore, the requisite intent to deceive. The most egregious misrepresentations and omissions that the court cannot excuse are set forth as follows:

1.     The conscious effort to avoid the disclosure of the Travis trust, and, to a lesser extent, the failure to account for all distributions from the Toler trust. The defendant's Schedule B - Personal Property, Item 20. has never been amended to reflect the defendant's interest in these two trusts. The defendant's evasive conduct at the First Meeting of Creditors and during her Rule 2004 examination clearly reflects a concerted effort to conceal the Travis trust from disclosure. Her responses were at best intentionally misleading and at worst fraudulent.

2.     The defendant received lump sum alimony in the total amount of $135,000.00 within  two years of the date that she filed her bankruptcy petition. Neither her original SOFA nor her amended SOFA correctly reflect this award.

3.     The defendant did not disclose that she earned $8,207.00 in business income during 2008 which was reported on her personal income tax return. This was omitted on her original SOFA, and never corrected on the amended SOFA.

4.     The defendant failed to accurately report the taxable interest and the ordinary dividends that were generated from the Toler trust. She also

33

has yet to disclose whether she received any distributions from this trust in calendar year 2010. She clearly did not include the Toler trust income in her amended means test calculation, and she also failed to add any distributions from this trust when she amended Schedule I.

5.     The defendant failed to disclose in her original SOFA a $10,000.00 payment that she made in order to retain legal counsel for her boyfriend, Richard Troy Jones. Only after being interrogated at the first meeting of creditors hearing and during her Rule 2004 examination did she disclose this retainer payment in her amended SOFA.

6.     The defendant initially misrepresented and then failed to correct the listing of "Child Support/Alimony" in her original SOFA and amended SOFA in the sum of $22,400.00. If the defendant actually wanted to disclose all of the alimony and child support that she had received within the two years prior to filing her bankruptcy petition, she would have had to add the lump sum alimony, the $1500.00 per month child support, and the $300.00 per month for medical insurance that her former spouse paid for a period of 18 months. Obviously, this number would greatly exceed $22,400.00.

The court cannot allow the defendant to recklessly disregard the integrity of the bankruptcy process, which includes the statutorily mandated duties of a debtor set forth in the Bankruptcy Code. Some of her actions were intentional and others perhaps were simply negligent. However, there are just too many significant misrepresentations and omissions, which remain uncorrected, for the court to conclude that there was "no harm, no foul." In keeping with the standards articulated by the Fifth Circuit Court of Appeals, the court is of the opinion that the plaintiff has established by a preponderance of the evidence that the defendant knowingly and fraudulently made material fraudulent representations and omissions in connection with her bankruptcy case. The defendant's discharge will be denied pursuant to § 727(a)(4)(A) of the United States Bankruptcy Code.

A separate order will be entered contemporaneous with this opinion.

This the _10_ day of November, 2011.

DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE

35